**SEALED** FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

2016 SEP -8  AM 9: 44

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. **SA16CR0618** |
| Plaintiff, | ) | **INDICTMENT** |
| v. | ) | [Vio.: 18 U.S.C. § 1343 Wire Fraud] |
| CHARLES AUGUSTUS BANKS, IV, | ) | |
| Defendant. | ) | |



THE GRAND JURY CHARGES

## INDICTMENT

## INTRODUCTION

At all times relevant to this Indictment:

1. Gameday Entertainment LLC (Gameday) doing business as Gameday Merchandising, is a sports merchandiser and event promoter that provides retail merchandising services and retail facility management services. It was founded in 2010 and is based in Lone Tree, Colorado. **CHARLES AUGUSTUS BANKS, IV,** was the Chairman of the Board of Directors for Gameday. The Chief Executive Officer for Gameday was J.N.

2. Comerica, Inc. (Comerica), doing business as Comerica Bank, is an American financial services company founded in Detroit, Michigan, and currently headquartered in Dallas, Texas. In addition to Michigan and Texas, it has retail-banking operations in Arizona, California, New York, Massachusetts, Washington, and Florida, and select business operations in several other U.S. states, as well as in Canada and Mexico.

3. SunTrust Banks, Inc., (SunTrust) headquartered in Atlanta, Georgia, is a national banking organization, serving a broad range of consumer, commercial, corporate and institutional clients. Its primary businesses include deposit, credit, trust and investment services. Through various subsidiaries the Company provides mortgage banking, insurance, brokerage, investment management, equipment leasing and investment banking services. The SunTrust Sports and Entertainment Specialty Group, a subsidiary of SunTrust, has offices in Atlanta, San Diego, Los Angeles, Charlotte, Daytona Beach, and Nashville. The group provides comprehensive wealth management services to musicians, actors, artists and athletes and their representatives, including personal banking and credit, investment management, financial planning, insurance, trust administration, estate strategies and capital markets, as well as intellectual property lending and industry-specific financing. On May 11, 2011, SunTrust acquired the assets of CSI Capital Management Inc. (CSI), an investment advisory firm in California that specialized in managing the assets of high net worth individuals and professional athletes.   Among the client portfolios acquired by SunTrust as a result of the acquisition of CSI was the portfolio of T.D.

4. **CHARLES AUGUSTUS BANKS, IV,** was an investment counsellor and venture capitalist who raised capital for business ventures by locating wealthy individuals and encouraging them to invest in various businesses by either buying a share of the business or by providing loans to the business. He operated a number of businesses that he offered as investment opportunities and he also raised funds for other businesses for which he was compensated by the business.   Prior to 2007,

**CHARLES AUGUSTUS BANKS, IV,** worked for CSI. **CHARLES AUGUSTUS BANKS, IV,** ultimately rose to be President of CSI in 2000. In 1998, while working at CSI, **CHARLES AUGUSTUS BANKS, IV,** met and recruited T.D. as a client for CSI. **CHARLES AUGUSTUS BANKS, IV,** was responsible for managing the relationship between CSI and T.D. and served as the communications conduit between the company and T.D. In 2007, **CHARLES AUGUSTUS BANKS, IV,** left his position as president of CSI. In 2011, CSI sold its investment business and transferred its clients to SunTrust. **CHARLES AUGUSTUS BANKS, IV,** continued to maintain a relationship with T.D. and would approach T.D. regularly to offer investment advice and encourage him to invest or loan money in projects in which **CHARLES AUGUSTUS BANKS, IV,** was involved. T.D. was aware that CSI had been purchased by SunTrust, but believed that **CHARLES AUGUSTUS BANKS, IV,** was still his financial advisor. **CHARLES AUGUSTUS BANKS, IV,** advised the account managers with SunTrust that he would continue to serve as the communications conduit between SunTrust and T.D. at the request of T.D.

## SCHEME TO DEFRAUD

Gameday was formed in early 2010. Almost immediately, J.N. realized that he needed additional capital to operate and expand Gameday. On October 15, 2012, **CHARLES AUGUSTUS BANKS, IV,** arranged for T.D. to receive a $10,000,000.00 line of credit from Comerica. On October 25, 2012, a contract was entered into between Gameday and T.D. whereby T.D. loaned Gameday $7,500,000.00 by calling on T.D.'s line of credit with Comerica. As a part of the contract, T.D. was to receive monthly interest payments at an annual rate of 12%. He was

also given a security interest in all of the assets of Gameday. **CHARLES AUGUSTUS BANKS, IV,** specifically told T.D. that the agreement gave him "first position" as a creditor against Gameday.

Gameday was soon in need of more capital. J.N. began to explore with Comerica the possibility of obtaining an additional line of credit. **CHARLES AUGUSTUS BANKS, IV,** and J.N. proposed to Comerica that the new line of credit would be guaranteed by K.G. and T.D. Additionally, in exchange for the line of credit, Comerica required a primary security interest in the assets of Gameday and required that all other creditors be subordinated to their interest. **CHARLES AUGUSTUS BANKS, IV,** arranged for T.D. to sign an agreement guaranteeing the new line of credit and subordinating his own security interests. **CHARLES AUGUSTUS BANKS, IV,** advised T.D. that the agreement that he was entering into was a modification of his earlier $7,500,000.00 loan and effectively reduced his exposure by $1,500,000.00 should Gameday default on the loan. In fact, the new loan guarantee agreement was not a modification of the earlier $7,500,000.00 loan agreement and created an additional $6,000,000.00 contingent liability for T.D. Moreover, the security interest that T.D. had in the Gameday assets was specifically being subordinated to Comerica, putting T.D. further back in the line of creditors should Gameday go bankrupt or default on its loans. This new agreement became effective on June 28, 2013.

As a result of having obtained these two loan guarantees from T.D., **CHARLES AUGUSTUS BANKS, IV,** was able to receive commissions and payments for his personal use.

### MANNER AND MEANS

1. On October 15, 2012, **CHARLES AUGUSTUS BANKS, IV,** arranged for T.D. to obtain a $10,000,000.00 line of credit with Comerica.

4

2. On October 25, 2012, T.D. entered into a contract with Gameday whereby he loaned Gameday $7,500,000.00 by drawing on his line of credit with Comerica and wiring the proceeds to Gameday.

3. On June 4, 2013, **CHARLES AUGUSTUS BANKS, IV,** sent an e-mail directing Comerica to send only the signature pages of the new $6,000,000.00 loan guarantee and subordination agreements to T.D.

4. On June 4, 2013, the following series of text messages were exchanged between **CHARLES AUGUSTUS BANKS, IV,** and T.D.:

    From **CHARLES AUGUSTUS BANKS, IV**:

    "On the good news front Gameday is crushing.  We are changing your 7.5m loan to 6m.  Paying it down 1.5m.  Sending you an amendment to the loan I need you to send back when you get it.  Turning out to be even better than hoped."

    T.D. responded:

    "Why are we changing the loan?? If it is crushing should I get more of the company??  Or at least what was agreed upon??  I'm confused."

    **CHARLES AUGUSTUS BANKS, IV,** responded:

    "My fault for not explaining more clearly.  Your exposure is going down but your upside remains and your monthly payments remain.  This just removes 1.5m of risk for you.  All GrEAT news.  No downside."

    At the time that these texts were sent, **CHARLES AUGUSTUS BANKS, IV,** well knew that his description of the new transaction and its effect on T.D.'s financial position with Gameday was false.

5. On June 7, 2013, the following series of text messages were exchanged between **CHARLES AUGUSTUS BANKS, IV**, and T.D.:

   From **CHARLES AUGUSTUS BANKS, IV**:

   "Good start! Faxing Gameday doc to you today. Which hotel?"

   T.D. responds:

   "Four Seasons. I'm under T.M. (name omitted) Rm. XXXX (room number omitted) Fax # XXXXXX7758 (fax number omitted)"

   **CHARLES AUGUSTUS BANKS, IV.**, responds:

   "Fax went through."

6. On June 26, 2013, the faxed signature pages for the new $6,000,000.00 loan guarantee were transmitted by T.D. to employees of **CHARLES AUGUSTUS BANKS, IV,** and to employees at Comerica.

7. On June 28, 2013, the $6,000,000.00 loan to Gameday by Comerica, guaranteed by T.D., was finalized.

8. On July 12, 2013, Gameday drew on the $6,000,000.00 line of credit by drawing $2,000,000.00 from the available line of credit and transferring it to the Gameday account.

9. On August 14, 2013, Gameday drew on the $6,000,000.00 line of credit by drawing $500,000.00 from the available line of credit and transferring it to the Gameday account.

10. On September 6, 2013, Gameday drew on the $6,000,000.00 line of credit by drawing $500,000.00 from the available line of credit and transferring it to the Gameday account.

11. On October 1, 2013, Gameday drew on the $6,000,000.00 line of credit by drawing $2,275,000.00 from the available line of credit and transferring it to the Gameday account.

## COUNT ONE
[18 U.S.C. § 1343]

The information set out above is incorporated fully herein.

On or about June 7, 2013, in the Western District of Texas and elsewhere and within the jurisdiction of the Court,

**CHARLES AUGUSTUS BANKS, IV,**

defendant herein, having devised the above described scheme or artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, did for the purpose of executing such scheme or artifice, cause to be transmitted by wire and radio communications, in interstate and foreign commerce, writings, signs, pictures, signals and sounds, specifically the sending by fax of two unsigned signature pages relating to a $6,000,000.00 loan guarantee and a subordination agreement from California to Florida, all in violation of Title 18, United States Code, Section 1343.

## COUNT TWO
[18 U.S.C. § 1343]

The information set out above is incorporated fully herein.

On or about June 26, 2013, in the Western District of Texas and elsewhere and within the jurisdiction of the Court,

**CHARLES AUGUSTUS BANKS, IV,**

defendant herein, having devised the above described scheme or artifice to defraud and to obtain

money by means of materially false and fraudulent pretenses, representations, and promises, did for the purpose of executing such scheme or artifice, cause to be transmitted by wire and radio communications, in interstate and foreign commerce, writings, signs, pictures, signals and sounds, specifically the sending by fax of two signed signature pages relating to a $6,000,000.00 loan guarantee and a subordination agreement from San Antonio, Texas, to California, all in violation of Title 18, United States Code, Section 1343.

A TRUE BILL

███████████████

Foreperson

RICHARD L. DURBIN, JR.
UNITED STATES ATTORNEY

By: _____
GREGORY J. SUROVIC
Assistant United States Attorney