IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | NO: SA-16-CR-618-FB |
| CHARLES AUGUSTUS BANKS, IV (1), ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF PLEA**

Defendant Charles A. Banks, IV, (BANKS) states that his attorneys have explained to him all of the elements of Count 2 of the Superseding Indictment, to which he is entering a plea of guilty, and it is his understanding that if he pleads not guilty, the United States would be required to prove each and every one of the elements to the unanimous satisfaction of a jury beyond a reasonable doubt. Charles Banks admits that the facts set out below are true and correct:

**I. The Long-Standing Business Relationship Between BANKS and T.D.**

CHARLES AUGUSTUS BANKS, IV (BANKS) is a venture capitalist who raises capital for business ventures by locating interested individuals and encouraging them to invest in various businesses by either buying a share of the business or by providing loans to the business. He operates a number of businesses that he offers as investment opportunities and he also raises funds for other businesses for which he is compensated by the business.

Between 1992 and 2007, BANKS worked for CSI Capital Management Inc. (CSI), an investment advisory firm in California that specialized in managing the assets of professional athletes. In 1997, while working at CSI, BANKS met and recruited T.D. as a client for CSI. BANKS was responsible for managing the relationship between CSI and certain clients, including T.D., and served as the communications conduit between the company and the clients. In 2000, BANKS became president of CSI. In 2007, BANKS left his position as president of CSI to pursue an interest in the wine industry. In 2011, CSI sold its investment business and transferred its clients to SunTrust. At that time T.D. signed a new agreement with

Sun Trust and had a new team of financial advisors at Sun Trust.

BANKS had been developing investments of his own in the hospitality industry (hotels and resorts) as well as in the wine industry.  While BANKS no longer maintained T.D. as a client after BANKS left CSI, he continued to maintain a relationship with T.D. and would approach T.D. from time to time to offer him opportunities to invest or loan money in projects in which BANKS was involved. T.D. invested in such opportunities multiple times between 2005 and 2010, investing millions of dollars in multiple funds controlled by BANKS, and earning substantial returns.

XP Entertainment (XP) was a sports merchandiser and event promoter based in Denver, Colorado.  J.N. formed Gameday Capital Partners Venture Fund I LP for the purpose of investing in XP.  BANKS solicited T.D. to invest $500,000 into this venture.  BANKS was a partner with K.G. in a company called Hammer Holdings (HH).  BANKS and K.G. both personally guaranteed a loan for more than $3,000,000 to HH, which they have since re-paid.  Of this money, HH invested $3,000,000 into XP.  XP filed for bankruptcy in 2009 and Gameday Entertainment LLC (Gameday) was formed to purchase the assets of XP out of bankruptcy in early 2010.  In order to fund the bankruptcy purchase and provide operating capital for the new business, BANKS and the CEO of Gameday, J.N., arranged for K.G. to guarantee an $8,000,000.00 loan from Comerica Bank to Gameday.

Gameday's primary business was the sale of authorized sporting event and team logo merchandise (e.g. shirts and hats) at professional sports venues under licenses of the professional sports team.  Gameday acquired the rights to provide merchandise at a range of sporting events including the 2013 America's Cup, the 2012 NBA All-Star Game, and the 2011 USA Pro Cycling Challenge.  It also had contracts with over a dozen college and professional sports teams, including the Dallas Mavericks, the Washington Nationals, the Golden State Warriors and the Oklahoma City Thunder.  BANKS acted as a consultant to Gameday.  Although BANKS was given the title of "Chairman", Gameday had no board of directors, and BANKS was not involved in the day-to-day management of the company.  J.N., as CEO, was responsible for managing and operating Gameday.

Approximately two years later, J.N. realized that he needed additional capital to operate and expand Gameday. Although Gameday was successfully growing its business, it was often in need of cash in order to secure and maintain sufficient inventory.  On October 15, 2012, T.D. was given a $10,000,000 line of credit from Comerica Bank. On October 25, 2012, a contract was entered into between Gameday and T.D. whereby T.D. loaned Gameday $7,500,000 by calling on T.D.'s line of credit with Comerica Bank.  As a part of the contract, which had been negotiated by J.N., T.D. was to receive monthly interest payments at an annual rate of 12%, which he did receive for more than two years.

## II.  The Course of Action Leading to Charges

J.N. soon began to explore with Comerica Bank the possibility of obtaining an additional line of credit for $6,000,000.00.  In May 2013 J.N. proposed to Comerica Bank that the new line of credit would be guaranteed by both K.G. and T.D. J.N. referred to this line of credit as an "inventory loan", and assured BANKS that Gameday's inventory was sufficient to cover the $6,000,000 loan.  It was the understanding of K.G. and BANKS that K.G. would

guarantee $3,000,000, and T.D. would guarantee $3,000,000.  In exchange for the line of credit, Comerica required a primary security interest in the assets of Gameday and required that all other creditors, including their client T.D., be subordinated to their interest.  BANKS arranged for T.D. to sign an agreement guaranteeing the new line of credit and subordinating his own security interests. This new agreement became effective on June 28, 2013.

Prior to the new agreement being signed, BANKS, who frequently communicated with T.D. by text message, sent the following text message to T.D. on June 4, 2013:

> "On the good news front Gameday is crushing. We are changing your 7.5m loan to 6m. Paying it down 1.5m. Sending you an amendment to the loan I need you to send back when you get it.  Turning out to be even better than hoped."

T.D. responded:

> "Why are we changing the loan?? If it is crushing should I get more of the company?? Or at least what was agreed upon??  I'm confused."

BANKS responded:

> "My fault for not explaining more clearly. Your exposure is going down but your upside remains and your monthly payments remain. This just removes 1.5m of risk for you. All GrEAT news.  No downside."

However, the new loan guarantee agreement was not a modification of the earlier $7,500,000.00 loan agreement and created an additional $6,000,000.00 contingent liability for T.D.  Additionally, the security interest that T.D. had in the Gameday assets was being subordinated to the new Comerica loan.  At the time that he sent these texts to T.D. on June 4, 2013, BANKS knew that they were untrue, in that they did not accurately describe the guarantee, or he sent those texts with reckless indifference to their truth or falsity.  BANKS engaged in this course of action with respect to the $6,000,000 guarantee for the purpose of securing T.D.'s signatures on the documents prepared by Comerica Bank.

### III.  The Interstate Wire Communication

On June 7, 2013, an employee for BANKS, faxed the two signature pages for the $6,000,000.00 guarantee and subordination agreement from California to T.D. in Miami, Florida.  On June 26, 2013, T.D. faxed the two signature pages from his personal fax machine located at his house in San Antonio, Texas, to the fax number for Terroir Capital located in California. (BANKS does not have independent knowledge as to when T.D. faxed the documents, but does not dispute the dates alleged by the government.)  Later in the day, an employee of BANKS sent faxed copies of the two signed signature pages to Comerica Bank and those signature pages were used to close the $6,000,000.00 guarantee loan.

BANKS admits that he caused to be transmitted by way of wire communications in interstate commerce from the Western District of Texas to California a writing, signal or sound for the purpose of securing T.D.'s signature on the guarantee and subordination agreements.

Comerica has not attempted to collect against its client, T.D., in connection with the $6 million guarantee, and T.D. has not been required to make any payments on the guarantee. K.G. has reached an agreement with Comerica which has put to rest Comerica's claims based upon the guarantees, and extinguishes any exposure T.D. may have had on that guarantee. Even prior to K.G. and Comerica reaching this settlement, BANKS had told K.G. that BANKS will cover T.D.'s portion of the guarantee, and BANKS intends to honor that pledge.

### IV.  Facts as Related to Essential Elements

*First:* Charles Banks engaged in a course of conduct intended to secure Tim Duncan's signatures on a Guarantee and Subordination Agreement to Comerica Bank in order to fund a loan from that bank to Gameday.

*Second:*  That the course of conduct involved representations sent by text message to Tim Duncan that included statements that were untrue or were made with a reckless indifference to their truth or falsity.  The representations were material, that is they had a natural tendency to influence, or were capable of influencing Tim Duncan in his decision to sign the Guarantee and Subordination Agreement.

*Third.*   The signature pages of the Guarantee and Subordination agreements were faxed by wire in interstate commerce from Tim Duncan in San Antonio, Texas, to Los Angeles, California.

*Fourth:*   Charles Banks acted with a knowing intent to deceive Tim Duncan.

### V. Non-Concurrence Of The Parties

The Government and the Defendant are submitting to the Court differing Statements of Fact. The Defendant concurs that the Elements of the Offense as stated in Section I. of the Government's Statement of Facts correctly follows the applicable Fifth Circuit Pattern Jury Instructions.  The Government and the Defendant do not agree with the details of Section II. of the Government's Statement of Facts, and for that reason the Defendant files this, his own Statement of Facts.  It is likely the Government will not object to Section IV. of the Defendant's Statement.

## VI. Conclusion

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the Court consider and rely upon this Statement of Facts filed by Defendant.

Respectfully submitted

/s/_____
JOHN E. MURPHY
Attorney for Defendant
TX Bar No. 14701500
14439 NW Military Highway
Suite 108-133
San Antonio, TX 78231

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of March, 2017, a true and correct copy of the foregoing Defendant's Statement of Facts In Support of Plea was electronically filed with the Clerk of Court using the CM/ECF System that will transmit notification of such filing to all attorneys of record in this case.

/s/ John E Murphy